UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NO. 20 - 6610 - Hunt

**IN RE SEALED COMPLAINT**

_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?  __ Yes X No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  __ Yes X No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?  __ Yes X No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: /s/ Alexander T. Pogozelski
Alexander T. Pogozelski (Court ID No. A5502549)
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 510-2208
Email: alexander.pogozelski@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>JORGE GAVIRIA ,<br><br>_____<br>*Defendant(s)* | )<br>)<br>) Case No. 20-6610-HUNT<br>)<br>)<br>) |

**CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __December 2019 through September 2020__ in the county of _____Miami-Dade_____ in the ___Southern___ District of __Florida, and elsewhere__ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | GAVIRIA conspired with others to dispense and distribute a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of Oxycodone. |

This criminal complaint is based on these facts:

See the attached affidavit of FBI Special Agent Jacqueline Erwin

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Jacqueline Erwin, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ____telephone____ (specify reliable electronic means)

Date: __11-22-2020__

_____
*Judge's signature*

City and state: __Ft. Lauderdale / Miami, Florida__    Patrick M. Hunt, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 20-6610-HUNT

UNITED STATES OF AMERICA

v.

JORGE GAVIRIA,                    **FILED UNDER SEAL**

   Defendant.
_____/

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Special Agent Jacqueline Erwin, being duly sworn, do hereby depose and state:

**AFFIANT'S BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, currently assigned to the Miami, Florida, Field Division. As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 21, United States Code, Section 878, as well as Title 18, United States Code, Section 2510(7), and therefore am empowered to conduct investigations of, and make arrests for, the controlled substances offenses enumerated in Title 21 of the United States Code.

2. I have been an FBI Special Agent since March 2018 and have been assigned to the Miami Field Division since July 2018. While employed with the FBI, I have participated in various investigations involving drug diversion, wire fraud, health care fraud, and money laundering.

3. This affidavit is written in support of a criminal complaint charging

JORGE GAVIRIA ("GAVIRIA") with conspiracy to dispense and distribute a controlled substance, in violation of Title 21, United States Code, Section 846. The facts contained in this affidavit are based on my personal knowledge and observations as well as facts provided by other law enforcement officers, witnesses, and documents. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that GAVIRIA and others, known and unknown, conspired to dispense and distribute a controlled substance, in violation of Title 21, United States Code, Section 846.

4. This affidavit does not contain all the facts of this investigation known to me or to other law enforcement personnel. Rather, it sets forth only those facts necessary to establish probable cause in support of a criminal complaint charging GAVIRIA with a violation of Title 21, United States Code, Section 846.

## NATIONAL OPIOID EPIDEMIC AND PILL MILLS

5. Oxycodone (brand name OxyContin, Percocet, Roxicodone) is a generic name for a narcotic analgesic classified under federal law as a Schedule II controlled substance, meaning that the drug has an accepted medical use and a high potential for abuse. Oxycodone is a medication used to treat severe pain. Like other opioids, Oxycodone is highly addictive. Due to its addictive nature, the lawful and legitimate use of Oxycodone often leads to addiction and the unlawful and unmonitored use of opioid-based street drugs, such as heroin and fentanyl.

6. Due to its addictive nature, individuals often abuse Oxycodone, which has created a black market for the narcotic. While many patients receive Oxycodone from legitimate physicians genuinely practicing medicine, others, including drug traffickers,

often obtain Oxycodone through complicit doctors who prescribe narcotics without a legitimate medical purpose and outside the usual course of professional practice in exchange for money. This criminal scheme has come to be known as a pill mill scheme; it is also referred to as opioid or drug diversion.

7. Pill mill (or drug diversion) schemes benefit the complicit doctors through the generation of additional business revenue from the addition of large volumes of new patients, often drug traffickers, who pay to visit the doctor for the sole purpose of obtaining a prescription for Oxycodone. The scheme benefits drug traffickers by providing them with a supply of narcotics to sell on the black market.

8. A pill mill scheme cannot operate without a medical professional capable of prescribing narcotics and willing to do so in violation of the law. From a review of various statutes and regulations, I know that the dispensing and distribution of controlled substances must meet certain federal and state rules and regulations. Specifically, I know the following:

    a. The Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.*, creates a comprehensive regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing and possession of substances classified in any of the CSA's five schedules.

    b. Pursuant to Title 21, United States Code, Section 822, controlled substances may only be prescribed, dispensed, or distributed by persons registered with the Attorney General of the United States to do so (with some exceptions, such as delivery persons). The Attorney General has delegated to the Drug Enforcement Agency ("DEA") authority to register such persons.

    c. Title 21, Code of Federal Regulations, Section 1306.04, requires that prescriptions for controlled substances written by physicians "be issued for a legitimate medical purpose" and that the physician be "acting in the usual course of his professional practice."

d. Title 21, United States Code, Section 841(a)(1), makes it unlawful, except under circumstances authorized by the statute, "for any person knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance." Title 21, United States Code, Section 846, makes it unlawful for any person to "attempt or conspire" to violate the CSA.

e. According to Florida Statute 458.3265(3)(c), a physician, a physician assistant, or an advanced practice registered nurse must perform a physical examination of a patient on the same day that the physician prescribes a controlled substance to a patient at a pain management clinic.

## THE DEFENDANT AND RELEVANT ENTITY

9. General Care Center Inc. ("GCC") was a cash-only pain clinic located at 7805 SW 24th Street/Coral Way, Suite 101, Miami, Florida 33155. On October 21, 2020, the owner of GCC, Habib Palacios, was arrested by Complaint and charged with conspiracy to dispense and distribute Oxycodone, in violation of Title 21, United States Code, Section 846. That same day, law enforcement executed a search warrant on GCC's premises.

10. GAVIRIA, a resident of Broward County, was a licensed medical doctor and physician provider at GCC. GAVIRIA worked at GCC from in or around December 2019 through in or around September 2020.

## PROBABLE CAUSE

11. In February 2018, based on a tip that GCC "dispensed pills and asked few questions," the government began investigating unlawful prescription practices at GCC. The ensuing investigation revealed evidence that GCC's physicians, including GAVIRIA, unlawfully dispensed and distributed Oxycodone to individuals who had no legitimate medical need for the drug.

4

12. As detailed below, this evidence includes: (1) undercover visits captured on video and/or audio recordings; (2) witness statements, including admissions GAVIRIA made during a voluntary interview with law enforcement; and (3) analysis of GAVIRIA's prescription data demonstrating that his prescribing patterns bore many of the hallmarks of a pill mill clinic.

## UNDERCOVER VISITS

13. Between in or around February 2018 through in or around October 2020, more than 15 undercover visits at GCC were conducted. These visits revealed that GCC's physicians, including GAVIRIA, prescribed high doses and pill counts of Oxycodone without a legitimate medical purpose and outside the course of professional practice, as demonstrated by the physicians' failure to conduct physical examinations or appropriate medical consultations of patients and the near uniformity in the physicians' prescribing practices.

14. These undercover visits, most of which were captured on audio and video recordings, further revealed the following: (1) that the confidential sources[1] paid between $250 and $300 in cash for their visits with GCC's physicians; (2) that GCC's waiting room was frequently crowded, with approximately fifty (50) patients waiting to see the doctor at any given time; (3) that the confidential sources were coached by GCC intake staff on what to say in order to obtain a pain prescription; (4) that their visits with GCC's doctors were very brief, often lasting only a few minutes; (5) that GCC's physicians generally did not perform a physical examination and asked the confidential sources limited, perfunctory questions during their brief encounters; and (6) that GCC's

---

[1] These confidential sources are proven reliable informants. In some instances, the confidential informants have been compensated for their undercover work.

5

physicians almost always prescribed the confidential sources unusually large quantities of Oxycodone 30 mg, the highest quick-release dosage of Oxycodone and most sought after form of the drug on the black market.

15. Specifically, on or about April 8, 2020, law enforcement conducted an undercover operation at GCC with a confidential source ("CS") who had never seen GAVIRIA during any of his/her prior visits to GCC. Upon entering GCC, the CS paid the office manager $250 in cash. In exchange, the office manager gave the CS a prescription that had already been signed by GAVIRIA for 120 pills of Oxycodone 30 mg, dated April 1, 2020. The CS then asked GCC's office manager if s/he could get another prescription for the following month and noted that s/he had enough cash to pay for the second prescription. The office manager agreed and collected an additional $250 in cash from the CS ($500 in total). The CS saw the office manager then approach GAVIRIA and instruct GAVIRIA to write another prescription, which GAVIRIA did, and the office manager returned with a second prescription signed by GAVIRIA for another 120 pills of Oxycodone 30 mg. Despite the fact that the CS had never seen GAVIRIA before, GAVIRIA did not perform a physical examination or even ask the CS any questions before GAVIRIA provided him/her with prescriptions for unusually large quantities of Oxycodone 30 mg.[2] Based on my training and experience, these facts are

---

[2] In order to compare opioids of different types and strengths, the drugs are converted into one standard value: morphine milligram equivalent ("MME"). The CDC recommends that physicians consider a patient's MME level when prescribing opioids. Specifically, the CDC recommends that when prescribing opioids to patients with chronic pain, prescribers use caution at any dosage; carefully consider any increases in daily dosages to 50 mg MME or more; and avoid increasing daily dosages to 90 mg MME or more. The two prescriptions GAVIRIA issued here were for daily dosages of 180 mg MME, or more than double the daily dosage the CDC recommends physicians avoid.

evidence that GAVIRIA dispensed and distributed Oxycodone outside the course of professional practice and without a legitimate medical purpose.

## COOPERATING WITNESS

16. One cooperating witness is GCC's former office manager ("Individual 1").[3] Individual 1 described GCC as a "pill mill" that should be closed down.

17. According to Individual 1, new patients at GCC generally paid $300 for the first visit, and then $250 for each subsequent visit. All patients at GCC paid in cash, as GCC did not accept insurance.

18. Based on my review of Prescription Drug Monitoring Program ("PDMP") data[4] for multiple GCC patients, I know that many of GCC's patients were beneficiaries of health insurance policies, including Medicare, that would have covered the cost of the medical visit had the patient visited a doctor that accepted insurance. Instead, these patients paid cash for visits with doctors at GCC. Based on my training and experience, I know that patients seeking opioids often pay cash for visits with physicians at pill mills rather than rely on their insurance benefits to pay for visits with legitimate doctors because they know the pill mill doctor will prescribe them the opioids they are seeking.

19. In general, Individual 1 recalled that doctors at GCC were paid approximately $100 per patient.

---

[3] This individual is cooperating with the hope of receiving a lesser sentence once s/he is charged with federal offenses and convicted for his/her unlawful conduct at GCC.

[4] The Florida Department of Health's Prescription Drug Monitoring Program, called E-FORCSE, collects, maintains, and stores controlled substance prescription dispensing information in its database and makes the information available to health care practitioners and law enforcement and regulatory agencies during active investigations.

20. According to Individual 1, GCC's owner, Palacios, instructed doctors that they must write prescriptions for Oxycodone 30 mg. In fact, Individual 1 personally heard Palacios tell GAVIRIA that GAVIRIA had to write prescriptions for Oxycodone or Palacios would not pay him.

21. According to Individual 1, many patient recruiters (or sponsors) brought patients to GCC for the purpose of obtaining medically unnecessary opioid prescriptions. Based upon my training and experience, I know that pain clinics that divert narcotics often require individuals they know to introduce and tacitly vouch for new patients, so-called patient recruiters or sponsors. These patient recruiters bring patients to the pain clinics in order to obtain prescriptions for Oxycodone 30 mg and the patient recruiters usually pay for the office visit. In return, the patient recruiters obtain the patient's Oxycodone 30 mg pills in exchange for cash or another agreed-upon payment (often a portion of the pills), and then sell the pills on the black market.

22. According to Individual 1, some patient recruiters brought as many as fifty (50) patients to GCC. Individual 1 further stated that, on at least some occasions, patient recruiters picked up Oxycodone 30 mg prescriptions from GCC in batches for their patients (*i.e.*, their patients did not even visit the clinic to obtain the prescriptions written for them).

23. Individual 1 stated that GAVIRIA routinely wrote prescriptions for Oxycodone for patients who had no legitimate medical need for the drug. For example, Individual 1 obtained prescriptions for unusually large quantities of Oxycodone 30 mg from GAVIRIA, despite the fact that Individual 1 has no medical need for the drug and simply sold his/her pills on the street.

24. Individual 1 also stated that in May of this year GAVIRIA was regularly writing prescriptions for Oxycodone for patients he did not even see. As a result, GAVIRIA made a lot of money, because all he had to do was sign prescriptions while GCC staff handled the other tasks, including making notations in patients' files, and patients simply stopped by the clinic to pick up their prescriptions.

## GAVIRIA'S STATEMENTS

25. GAVIRIA was interviewed by law enforcement on October 21, 2020 during the execution of a search warrant on GCC's premises.[5]

26. GAVIRIA stated that for the five or so years before he started at GCC, GAVIRIA worked at a medical spa where he primarily performed cosmetic surgeries and hair transplants. Towards the end of 2019, GAVIRIA started working at GCC because he needed money. At GCC, GAVIRIA was paid $100 per patient in cash.

27. GAVIRIA acknowledged that GCC was a cash-only clinic that did not accept any health insurance.

28. During the pandemic, GAVIRIA wrote prescriptions for over 40 patients a day, but did not physically see all of the patients. According to GAVIRIA, there were so many patients coming to GCC that it was impossible for GAVIRIA to see them all. As a result, GAVIRIA admitted, he wrote pain prescriptions for patients he did not see.

29. GAVIRIA also admitted that during this time he wrote two months' worth of pain prescriptions for some patients and was paid for each prescription he wrote, despite the fact that the prescriptions were written during the same "consultation." Based on my training and experience, the payment of $250 in cash for each pain prescription

---

[5] Because GAVIRIA was free to end the conversation with law enforcement at any point and leave of his own accord, his interview was voluntary and non-custodial.

9

obtained during one visit to GCC is inconsistent with the practices of legitimate clinics where patients pay for the actual encounter with a medical provider. Further, this is evidence that these pain prescriptions were issued outside the course of professional practice and without a legitimate medical purpose.

30. GAVIRIA admitted that he prescribed Oxycodone to patients who did not appear to need Oxycodone.

31. GAVIRIA identified one specific patient recruiter by name, noting that this recruiter brought several patients to GCC in order to obtain Oxycodone prescriptions. This patient recruiter asked GAVIRIA to write prescriptions for 120 pills of Oxycodone 30 mg for his patients and would slip a $20 bill in GAVIRIA's shirt pocket in an effort to have his patients seen more quickly. GAVIRIA acknowledged that there were other patient recruiters who similarly brought patients to GCC.

32. All of the recruiters' patients knew what to say in order to obtain a prescription for Oxycodone. GAVIRIA admitted that he wrote prescriptions for Oxycodone for these patients, despite his knowledge that the patients did not actually need the drug.

33. Since he began working at GCC, numerous pharmacies started refusing to fill his prescriptions because of his aberrant prescribing practices. When he called CVS to ask about its refusal to fill his prescriptions, GAVIRIA was told it was because he was "from the 120 clinic," a reference to the fact that he regularly provided patients with prescriptions for 120 pills of Oxycodone 30 mg. GAVIRIA was eventually told by one of GCC's owners to resign from GCC when many or all of the pharmacies in the area refused to fill his prescriptions.

34. Towards the end of the interview, GAVIRIA admitted that GCC was an Oxycodone clinic and that it was likely GCC's patients were selling their Oxycodone pills on the street.

## **PRESCRIPTION DRUG DATA**

35. Law enforcement has also reviewed data regarding GAVIRIA's prescribing practices from two sources: (1) Florida's PDMP data, which keeps a record of prescriptions for controlled substances dispensed by pharmacies, including for GAVIRIA; and (2) reports generated by a large pharmacy chain analyzing prescriptions issued by GAVIRIA.

36. Analysis of GAVIRIA's PDMP data revealed that, out of all the controlled substance prescriptions he wrote while working at GCC, approximately 99% of them were for opioids. Of those opioid prescriptions, approximately 91% were for Oxycodone 30 mg, the highest quick-release dosage of Oxycodone and most sought after form of the drug on the black market. In total, according to PDMP data, during his approximate 10-month tenure at GCC, GAVIRIA prescribed more than 350,000 Oxycodone 30 mg pills. Based upon my training and experience, these facts are evidence GAVIRIA prescribed Oxycodone 30 mg without a legitimate medical purpose and outside the course of professional practice. Further, GAVIRIA's prescribing patterns are consistent with those of other GCC physicians, including one who is cooperating and has signed a plea agreement admitting to his/her role in the conspiracy to dispense and distribute Oxycodone, in violation of Title 21, United States Code, Section 846.

37. In addition, a report generated by a large pharmacy chain analyzing GAVIRIA's prescribing practices revealed similar patterns indicative of opioid diversion.

This report identified numerous red flags of diversion in GAVIRIA's practices, including the following: (1) GAVIRIA routinely wrote prescriptions for unusually large quantities of opioids or high starting doses; (2) GAVIRIA provided the same diagnosis for a majority of his patients; (3) GAVIRIA routinely wrote prescriptions for a cocktail of commonly abused drugs; and (4) GAVIRIA wrote the same medication dosage directions for a large number of patients. This pharmacy then implemented a "central block" on GAVIRIA, refusing to fill any more of his controlled substance prescriptions.

## CONCLUSION

38. Wherefore, based upon the above information, I believe probable cause exists that, in Miami-Dade County, in the Southern District of Florida, JORGE GAVIRIA did conspire with others to dispense and distribute a controlled substance, in violation of Title 21, United States Code, Section 846.

39. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief this 22nd day of November, 2020, in Miami, Florida.

FURTHER AFFIANT SAYETH NAUGHT

_____
Jacqueline Erwin
Special Agent
Federal Bureau of Investigation

Attested to in accordance with the requirements of
Fed. R. Crim. P. 4.1 by ~~FaceTime~~ this 22nd day
of November, 2020. telephone

_____
PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE

12